**BOLT ASSOCIATES, INC., Plaintiff,**

v.

**The TRUSTEES OF COLUMBIA UNIVERSITY IN the CITY OF NEW YORK, Defendant.**

United States District Court
S. D. New York.

Jan. 17, 1966.

———◇———

Robertson, Bryan & Parmelee, Stamford, Conn., Kane, Dalsimer, Kane & Smith, New York City, Roland T. Bryan, Donald W. Robertson, and G. Kendall Parmelee, Stamford, Conn., Haynes N. Johnson, New York City, of counsel, for plaintiff.

Thacher, Proffitt, Prizer, Crawley & Wood, New York City, Edward C. Kalaidjian and Arnold Buffum Lovell, New York City, of counsel, for defendant.

HERLANDS, District Judge:

This is a motion by the plaintiff for a preliminary injunction. It is denied in all respects for the reasons set forth in this opinion.

*Subject Matter of the Litigation*

The trade secret and device involved in this case concern the plaintiff's un-

patented underwater pneumatic acoustical repeater for use in submarine geophysics, the seismological branch of oceanography, for the purpose of developing a profile picture and topography of the ocean floor and the stratification and thickness of the sediments beneath it.

Aside from commercial application, such and similar devices are an essential implement in the defendant's performance of oceanographic research since November, 1960, for the Navy Department looking to improvements in the techniques of undersea warfare, subsurface deployment and navigation of submarines and methods to locate and destroy enemy craft. Disclosure of further details of this character would impinge upon a security classified underseas warfare development program.

*The Complaint*

According to the complaint, verified by the plaintiff's president and filed December 6, 1965, the action is for "unfair competition by the misappropriation of a trade secret belonging to plaintiff" (Complaint, paragraph "1"). Jurisdiction is founded upon diversity of citizenship.

The complaint alleges that, in the spring of 1961, plaintiff's predecessor in interest discovered, designed and developed a secret process and device "for conducting ocean floor surveys using echo sounders in which the sound source is comprised solely in the release of air under pressure" (Paragraph "5"); that in June 1961, the plaintiff confidentially informed the defendant that it had developed a secret process and device for oceanographic work in which the sound is produced solely by the explosive release of high pressure air and, in that month, the plaintiff secretly demonstrated the said process and device to three named employees of the defendant for the expressed "purpose of determining whether the defendant wished to obtain and pay for a license to utilize" plaintiff's device and system (Paragraphs "6", "7" and "15"); that shortly thereafter the defendant misleadingly told the plaintiff that it was "not interested" in the plain-

tiff's device whereas, in fact, the defendant "secretly built" a device "closely resembling" the plaintiff's (Paragraphs "20" and "22"); that, since June 1961 and to the present, the defendant built a number of devices which "embodied features which were in" the plaintiff's device and the defendant misappropriated by extensive use the plaintiff's secret device (Paragraphs "21", "22" and "23"); that the defendant "at all times" secretly continued to develop such devices "for its own use and the benefit of the United States Navy" by misleading the Navy to the plaintiff's detriment (Paragraphs "24" and "26"); and that the defendant has been "unjustly enriched through its misappropriation of plaintiff's trade secret" (Paragraph "27"). The defendant will sometimes be referred to in this opinion as the "University".

*The Moving Affidavits*

In support of its motion, the plaintiff has submitted four affidavits: the first, by its president, Stephen Chelminski; the second, by one of its attorneys, Roland T. Bryan, sworn to December 4, 1965; the third, by its vice-president, John F. Gilbert; and the fourth, another affidavit by Mr. Bryan, sworn to December 23, 1965.

The Chelminski affidavit asserts that the manufacture and use of the defendant's device "would immediately and irreparably injure plaintiff" by threatening "to deny to plaintiff and to its licensee [Litton Industries] the exclusivity of its trade secrets" and by threatening "plaintiff's contract relationship with its licensee." (Paragraph "7".)

The Bryan affidavit deals solely with litigation in the United States District Court for the District of New Jersey, 244 F.Supp. 458, between this plaintiff and Alpine Geophysical Associates, Inc. and Walter C. Beckmann (hereinafter referred to as New Jersey defendants). The New Jersey action was one for breach of contract and trust, predicated upon a written, confidential agreement signed on July 19, 1961 and upon discussions looking to a license agreement. In the said confidential agreement, the New

Jersey defendants had promised not to use or incorporate plaintiff's design in building devices for others until a patent has been issued or denied to the plaintiff. The New Jersey defendants were charged with having misappropriated the plaintiff's trade secrets which they had obtained through the subterfuge of simulated negotiations and colorable agreements in 1961 and 1964. The plaintiff's application therein for a temporary injunction was denied (see "Enclosure 1" annexed to the Bryan affidavit) and its motion for partial summary judgment was granted on or about November 16, 1965. (See "Enclosures 2 and 3" annexed to said affidavit.) The District Court concluded *inter alia* that "The defense interposed by [the New Jersey] defendants that the specific model of sound source manufactured by them was developed by Lamont Geological Observatory of Columbia University, is no defense to the breach of contract by the defendants." ("Enclosure 2," Conclusion of Law "4".)

From the papers in the New Jersey proceedings submitted by the plaintiff, the following facts appear: (1) that, commencing in the 1950s, the University engaged in developing sound-generating devices for use in its study of oceanographic seismology; (2) that Chelminski (who later became the plaintiff's president) and Beckmann (who later became the president of the corporate defendant in the New Jersey action) had been regularly employed in the University's development laboratory (the Lamont Geological Observatory); (3) that, in June 1961, Chelminski demonstrated an air gun ("underwater pneumatic acoustical repeater") to the University but no drawings thereof were exhibited; (4) that the University declined to give Chelminski a development contract for his device but suggested that Beckmann might be interested in his proposition; (5) that thereafter the plaintiff and the New Jersey defendants entered into relationships that eventually spawned the New Jersey lawsuit; (6) that, in 1964, the University developed and fabricated prototypes of its own device operating with highly pressurized air as a sound source; (7) that, because the University's manufacturing facilities were inadequate to produce all of the devices needed in a ten months testing voyage planned for the summer of 1964, the University contracted with the New Jersey defendants to manufacture them in conformity with drawings and a model supplied by the University for that purpose; (8) that thereupon the New Jersey defendants proceeded to fill the University's purchase order by making the devices as per the University's drawings and model; and (9) that the University's and the plaintiff's devices are mechanically and functionally equivalent.

The Gilbert affidavit points out that the plaintiff received a rental contract (expiring July 23, 1965) from the Navy for "one of its repeating pneumatic acoustical sound sources"; and another rental contract (expiring August 17, 1965) from the Navy for two such devices.

The Bryan affidavit of December 23, 1965 presents documentary evidence that Alpine Geophysical Associates, Inc. (the corporate defendant in the New Jersey proceedings), incorporated in May 1957, filed a prospectus ("Enclosure 6") with the Securities and Exchange Commission in November 1961; that said corporation was "engaged in the commercial application of the oceanographic and earth sciences"; and that three employees of the University (John Ewing, Dr. Charles L. Drake and Dr. George H. Sutton) apparently had the following relationships with that corporation as of November 1961: (1) Mr. Ewing was "the Company's principal consultant in geophysics." He owned (as of September 30, 1961) 17,760 shares or 3.69% of the company's common stock, for which he paid $2,000 in cash. (2) Dr. Drake was a director and served as the company's "principal consultant in engineering geology." He owned (as of September 30, 1961) 17,760 shares or 3.69% of the company's common stock, for which he paid $2,000 in cash. (3) Dr.

Sutton served as the company's "principal consultant" in the fields of "seismology and seismic instrumentation." He owned (as of September 30, 1961) 17,-760 shares or 3.69% of the company's common stock for which he paid $2,000 in cash.

Neither the University nor any of its employees was named as a defendant in the New Jersey proceedings nor was any evidence reflecting adversely upon the University or any of its employees adduced in those proceedings.

After the argument of this motion and without having first obtained the court's permission, the plaintiff mailed to the court and opposing counsel selected excerpts from the depositions of John Ewing, Roger Zaunere and Angelo Ludas, taken in the New Jersey proceedings on May 7th and June 17th, 1965; two argumentative memoranda; and a letter which, among other things, states that the plaintiff would be agreeable to waive preliminary injunctive relief vis-à-vis the use and repair of pneumatic operated seismic survey devices currently employed on the defendant's research vessels at sea in connection with the federal government's submarine warfare research. All of these materials have been examined and considered by the court in deciding this motion.

The John Ewing deposition of May 7, 1965 discloses that he testified to the following facts: that, in the spring of 1961, during a research cruise, the University people decided "to go into some sort of compressed air source"; and they "started working on it" in the laboratory around May 15, 1961 (p. 57); that, in the spring of 1961, Roger Zaunere, a University employee, had conceived a device utilizing the submarine release of compressed air and this pneumatic air gun was experimentally operated in or about May or June 1961 (pp. 68, 69); that, about this time, when Chelminski telephoned Ewing and told him that he wanted to demonstrate a device with a compressed air sound source, Ewing replied, " * * * we [the University] were going in the same direction" (p.

59); that Chelminski then demonstrated a repeating pneumatic gun is the waters of the Hudson River for about an hour but did not exhibit any mechanical drawings and did not explain how the device worked (p. 60); that, during the demonstration, the observers were about six to ten feet away (pp. 78, 79); that Ewing told Chelminski that the University was not interested in giving him any development contract to continue in his work "because we [the University] were already involved ourselves. We would just as soon go ahead our way" (p. 60); that, in 1964, the University people developed an effective air-source device, made two or three of them by hand (pp. 61–62) and used them successfully on ships (p. 64).

The Roger Zaunere deposition of June 17, 1965 discloses that he testified to the following facts: that, in or about 1960 and from time to time, there had been discussion at the University about compressed air as an "obvious" sound source (p. 264); that, when Chelminski's device was demonstrated, it could not be seen when in the murky Hudson River waters (p. 268); that the University people thought that Chelminski's device "might have some possibilities" (p. 275); and that the University began to build its first prototype of an all pneumatic sound source about two or three months after the Chelminski demonstration (p. 279).

*The Answering Affidavits*

Opposing the motion, the University has submitted the affidavits of Maurice Ewing, John Ewing and Captain Edmund J. Hoffman.

Because these opposing affidavits sharply dispute each of the material elements of the plaintiff's proofs, the thrust of the defendant's evidence can best be appraised by summarizing that evidence topically. (References below are to the pages of cited affidavits.)

### INVENTION BY THE UNIVERSITY AND POSSIBLY OTHERS, NOT BY CHELMINSKI

The University invented and developed an underwater, acoustical sound emitter,

utilizing sudden, repeated blasts of compressed air into the ocean to create sound pulses which are reflected off the ocean floor and substrata and recorded on instruments aboard research vessels (Maurice Ewing, 1). The concept of creating a sound pulse by releasing air into the water is not novel. In 1940 and 1941, the Ewings and Joseph Warzel developed a non-repeating device to create sound with compressed air, at the Woods Hole Oceanographic Institution (John Ewing, 2). A number of other methods of releasing compressed air to make a noise were a matter of general knowledge (John Ewing, 2, 5).

In the period before June 1961, John Ewing and his colleagues at the University experimented with various sound emitters, including a compressed air device (John Ewing, 2–3).

Chelminski was employed in the University's Lamont Geological Observatory from July 16, 1958 to August 31, 1960. During that time, he was one of a small group assigned to develop, under supervision, a safe underwater sound emitter. This group, including Chelminski in particular, worked on several underwater sound emitters similar in principle to that which the plaintiff claims to have invented. While Chelminski was employed at the Lamont Observatory, Dr. Charles Drake, one of the Observatory's scientists, in 1959 reported to Chelminski's group that General Dynamics Corporation had developed an air actuated valve device ("Dynapak") that created repetitive sound pulses by sudden releases of compressed air (Maurice Ewing, 4–5; John Ewing, 6–7).

During the period between April and early August, 1961, John Ewing and Roger Zaunere built and successfully tested their own air gun (John Ewing, 3–4); and this followed their own but obvious application of well-known mechanical principles, without their having been influenced by Chelminski's June 16, 1961 "demonstration" (John Ewing, 5, 6).

Between 1961 and 1964, the University developed and experimented with several repeating underwater sound emitters and, by the summer of 1964, John Ewing and Roger Zaunere perfected a sound emitter that utilized the "Dynapak" valve (Maurice Ewing, 6, 7). This sound emitter was described in an article by John Ewing and Roger Zaunere, published in the November 1964 issue of the Journal of Geophysical Research (Maurice Ewing, 6–7; Exhibit "6").

### CHELMINSKI'S "DEMONSTRATION": ITS REAL PURPOSE

Contrary to Chelminski's present statements, he was not invited to "demonstrate" his device at the Lamont Observatory. He himself asked for an opportunity to operate it in the presence of University personnel. His telephonic request to John Ewing was granted. The device was operated a number of times on June 16, 1961 at a boat yard on the Hudson River, at Upper Nyack, New York. No condition of confidence or secrecy was imposed by Chelminski upon his operation of the machine. In fact, the operation was not actually a "demonstration" because the showing of the implement was interrupted by malfunctions and the appliance was not a successfully developed or perfected air gun (Maurice Ewing, 7, 9; John Ewing, 4–5).

Chelminski did not show any of the University personnel any drawing or blueprint of the machine, nor did he disassemble the device to expose its inner workings, nor did he explain how it operated, nor did it produce data for profile records (Maurice Ewing, 8).

Chelminski's real purpose, as shown by his own statement, was to obtain a grant of funds from the University to support further work by him to perfect the appliance. He was told that the University was not interested but that Mr. Beckmann, Chelminski's former supervisor and then in his own business, might be (Maurice Ewing, 8, 9).

Maurice Ewing is not aware of any oceanographic institute or private research corporation which uses plaintiff's machine (Maurice Ewing, 9).

## THE UNIVERSITY'S CROSS-CHARGE: PLAINTIFF HAS APPROPRIATED THE UNIVERSITY'S DEVICE

On August 31, 1960, Chelminski left the University's employment; and, in October, 1960, he formed a firm, which is the plaintiff's predecessor, to manufacture and sell oceanographic equipment. In so doing, Chelminski sought to exploit what he had learned at the Lamont Observatory (Maurice Ewing, 5–6).

Between 1961 and 1964, while John Ewing and Roger Zaunere were developing their sound emitter for the University, Chelminski visited the Lamont Observatory and was freely given information and shown drawings of the sound emitters then being developed at the Lamont Observatory. Whatever device in which the plaintiff claims a proprietary interest "represents the appropriation by plaintiff through Chelminski of information freely given to him by Lamont personnel" (Maurice Ewing, p. 7; John Ewing, 7).

## THE VITAL PUBLIC INTEREST AT STAKE

The making and the use of the device sought to be enjoined by the plaintiff are essential for the University's performance of oceanographic research for the Navy Department and the National Science Foundation (Maurice Ewing, 1). The University is performing three vitally important contracts for the Office of Naval Research in relation to improving the techniques of undersea warfare (Maurice Ewing, 2).

The Office of Naval Research, Navy Department, has provided approximately $2,000,000 by contract with the University for continued basic research in the field of oceanography; the Bureau of Ships, Navy Department, has a $260,000 contract with the University; and the National Science Foundation also has substantial projects with the University involving seismic reflection measurements (Captain Edmund J. Hoffman, 1).

The granting of the preliminary injunction requested by the plaintiff would seriously disrupt and gravely impede the University's vitally necessary naval research activities for a period of three to six months (Maurice Ewing, 2; Captain Hoffman, 2).[1]

The use of explosives, as a substitute for the sound emitter, is antiquated and unsatisfactory because it produces a double noise and otherwise does not function as effectively as the sound emitter (Maurice Ewing, 4).

## SEVERE ECONOMIC DAMAGE AND HARDSHIP IF INJUNCTION GRANTED

Pursuant to the contracts with the Navy Department and the National Science Foundation, the University employs its sound emitters aboard three research vessels. The cost of operating each of these vessels is about $2,000 a day. Should these vessels be idled or their use curtailed, the loss over a three-months period would exceed $400,000 (Maurice Ewing, 3).

The University's Lamont Geological Observatory employs about 400 people. About forty of them are involved in work directly related to the sound emitter and related data. Many of the other employees utilize, in their work, the information obtained through the use of the sound emitter. The granting of a preliminary injunction would disrupt the work of the Lamont Observatory, not only in connection with the Navy Department's project but also in the conduct of other basic research (Maurice Ewing, 3).

## DANGER OF DEATH AND PERSONAL INJURY IF INJUNCTION GRANTED

Issuance of the preliminary injunction requested by the plaintiff would require the University to substitute explosives

---

1. The letter addressed by plaintiff's counsel to the court after the oral argument herein, offering to narrow the scope of the requested interlocutory injunction, would not adequately protect the national security interest.

as a sound source in place of the sound emitter (Maurice Ewing, 2, 3).

This would introduce the material risk of death and injury to personnel aboard the research vessels, as experience shows (Maurice Ewing, 3–4).

## THE UNIVERSITY'S RELATIONS WITH ALPINE GEOPHYSICAL ASSOCIATES, INC.

The University personnel have not assisted Alpine Geophysical Associates, Inc. to use oceanographic equipment first designed, developed and tested at the University (Maurice Ewing, 8).

## THE NON-COMMERCIAL, NON-COMPETITIVE CHARACTER OF THE UNIVERSITY'S ACTIVITIES

The University uses its sound emitter "solely for oceanographic research." It does not sell or license its sound emitter commercially; nor does the University intend to compete with the plaintiff in its attempt to exploit the device commercially (John Ewing, 8).

## PLAINTIFF IS GUILTY OF LACHES

Plaintiff knew that the University personnel were working on repeating pneumatic sound emitters between 1961 and 1964. In 1962, Chelminski was shown drawings of the Lamont air guns, and made no claim that his rights were violated. John Ewing and Roger Zaunere published an article in the November 1964 issue of the Journal of Geophysical Research concerning their perfected sound emitter.[2] This action was not started until December 6, 1965 (Maurice Ewing, 10; John Ewing, 7).

### Summary and Conclusion

Each and every material allegation relied upon by the plaintiff is sharply disputed by the defendant. There is grave doubt about the probability of ultimate success by the plaintiff upon the trial of the action herein. The granting of a preliminary injunction would jeopardize the national security and impose great economic loss upon the defendant. If the plaintiff should prevail upon the trial, the defendant would be able to satisfy a money judgment. There is no evidence of irreparable damage to the plaintiff pending the trial. The balance of hardship weighs heavily in favor of the defendant. The plaintiff is guilty of inexcusable laches.

In view of all of the foregoing circumstances and in the exercise of the court's discretion,[3] the court denies plaintiff's application.

The foregoing constitutes the findings and conclusions required by Fed.R.Civ.P. 52(a).

So ordered.

---

2. Upon the oral argument of this motion, plaintiff's counsel admitted that, on December 10, 1964, a letter was written in behalf of the plaintiff to the University's president, showing that the plaintiff was fully aware of the existence of the University's device.

3. Imperial Chemical Industries Ltd. v. National Distillers and Chemical Corp., 354 F.2d 459 (2d Cir. Dec. 29, 1965); W. E. Bassett Co. v. Revlon, Inc., 354 F.2d 868, (2d Cir. Jan. 3, 1966).